## Ex Parte W. C. Epps and Joe McGraw.

### *No. 949.    Decided February 5th, 1896.*

**Habeas Corpus for Bail—Robbery by Exhibition and Use of Firearms.**

By amendment of Acts 24th Leg., p. 89, to Art. 722, Penal Code [New Penal Code, Art. 856]. Robbery, committed by the exhibition and use of firearms, is made a capital felony; and, upon habeas corpus for bail under a prosecution for such an offense, if the proof of the offense be evident, the accused are not entitled to bail.

APPEAL from the District Court of Cooke. Tried below before Hon. R. V. BELL, Special Judge.

This appeal is from a refusal of bail by the trial court on a hearing for bail under a writ of habeas corpus. Appellant had been indicted for the robbery of one J. W. Powers, by the use and exhibition of firearms, and by putting him in fear of life and bodily injury, etc.

The main facts are sufficiently shown by the following, taken from the testimony of J. W. Powers on direct examination: "About the 30th day of July, 1895, E. A. Peifer and I had charge of the general mercantile business at Muenster, Cooke County, Texas, of Powers & Peifer. O. E. Powers and E. A. Peifer composed the firm. I have had charge of the business at Muenster most of the time for three years. I have seen the defendants, Epps and McGraw before. On the 30th day of July, 1895, about 6 P. M. in the afternoon, I saw them in the store of Powers & Peifer, at Muenster, Cooke County, Texas, then and there. The first I saw of them they came in the south rear door of the Powers & Peifer's store. I was, at that time, selling a lady some goods. They, the defendants, walked in and went to about the center of the building, looked around some, and sat down on the dry goods counter. In a few minutes Mr. E. A. Peifer came in from supper. He walked up in the direction of where they, the defendants, were sitting, and they, the defendants, walked out on the front porch, and Mr. Peifer followed them. In a few moments Mr. Peifer went after a bucket of water. I then went to the office of the store in the building and commenced reading the firm's

mail, and as I raised my eyes, after reading a letter, one of the defend-
ants (here witness points out the defendant, Epps,) had me covered with
his pistol—that is, he had his pistol pointed at me, with the hand in
which it was, up near his face, as if sighting at me, and was eight or ten
feet from me. At this time the defendant, McGraw (who the witness
here designates by pointing him out in court), was near the rear end
of the building, about twenty-five or thirty feet from where I was
sitting on the stool, and had his pistol out in his hand. When
I saw the defendant, Epps, he had his on me. It kind of un-
nerved me. It made me feel like some one was going to shoot me.
I did not think of any one going to rob me. He, Epps, said: 'Throw
up your hands!' I was rather slow to comply with his demand and he
repeated it, three or four times, the last time saying: 'Throw up your
hands, or I will kill you.' I threw up my hands and Mr. Epps said, in
a very determined way, 'Open that safe,' referring to the iron safe of
Powers & Peifer, in the office, distant, not to exceed three or four feet
from me. I said to him: 'What is in that safe is hardly worth tak-
ing. We only keep enough money here to make change and transact
business.' He then made one step nearer to me, with his pistol all the
time pointed at me, it seemed to me at my eyes, and said: 'You open
that safe or I will kill you. If you do open it and do as I say, I will
not harm you.' I was, up to this time, sitting at the desk on a high
stool. I got down off of the stool and opened the safe. He said: 'Turn
your back,' and I did so, and this is the last time I got a good look at
him. Occasionally I would turn my face, and the defendant, Epps, said·
'See here, don't you turn your head around, you want to see too much.'
When I got down off of the stool and opened the safe, Epps, after making
me turn my back, approached the safe. There is a little steel box in the
safe which unlocked with a key, Epps said: 'Unlock this quick.' The key
was in the lock, and, as I turned around, Epps said: ''You turn around,
here is the key.' 'I can unlock it.' I then turned my back on him
again, when Epps remarked: 'This is a hell of an institution. You
have got more money than this here. There is money in these papers.
Haven't you got any deposits?' I told him no; our people were poor,
and all the money there was about the store was in those drawers.
During this time, I could hear him pouring something that sounded like
silver and gold money into something from the drawers in the safe,
where we had about $140, in gold, silver and other money of the United
States. The exact denomination of the money I do not know, except
that there was among it two five-dollar gold pieces, good lawful money
of the United States of America, of the value of $5 each. All the
money they took aggregated $140. The next thing he took out of the
safe was my private tin box. He said, 'Open this,' and then I turned
around and said, 'I haven't the key.' He said, 'You get the key, quick,
and stop looking at me.' I said, 'What is in there does not amount to
anything; there are about $30,000 or $40,000 worth of notes in there; I
can't collect them,—perhaps you can; you had better take the whole

business.' He said, 'You open it, and don't look at me.' I answered, that the key was in one of the drawers in the safe. He stepped to one side. I got the key and opened the box. The first thing that he got hold of was a lady's little bag or reticule, owned by my deceased wife. He shook and felt of it, and pitched it over on the desk. The next thing he came across was two large pocket-books full of notes. He said, 'Open these.' I opened them. He did not pull anything out, but just took a glancing look through them, and threw them down and left them there. He then said, 'Get in front of me,' and then started me back in the direction of the defendant, McGraw, who was standing with his pistol in hand. Just then Mr. Peifer returned from the well, where he had been after water, and defendant, McGraw, threw his pistol down on him, Peifer. A little boy came in about the same time. Defendant said to defendant, McGraw, 'Don't let this boy go out of here; if he undertakes to go out, kill him.' This boy was about five or six years old, named Tony Koll. Epps, the defendant, then took charge of both Mr. Peifer and I, and put us in the warehouse, which connects with the store. The door of the warehouse opens back into the warehouse and fastens on a staple with a clasp in the storehouse. Defendant, Epps, after getting into the warehouse, said to Mr. Peifer, 'Turn around here, I want to get a good look at you.' I heard the defendant, Epps, say to Peifer, 'I will just take this.' He then about faced him, turning his back to the defendant, Epps, and then said, 'If I hear either of you move, I will come back and kill you.' At least that is the impression he made on my mind, that if he heard either of us move, he would come back and kill us. He then fastened the door on the store side, and they got on their horses and left. Mr. Peifer jumped out of the warehouse window, ran around to the store and opened the door of the warehouse and let me out. When I got out, I saw the defendants on horseback, out on the prairie, about two or three hundred yards, and the horses were going at a pretty lively gait towards the northeast; and the defendants were kinder leaning over on their horses. Neither of the defendants had my permission to take the money or the watch. Mr. Peifer and I both had the care and control of the money and safe, and each one of us has a key to the safe. All the facts about which I have testified, occurred in Cooke County, Texas, on or about the 30th day of July, 1895. I got through waiting on the lady I was waiting on when the defendants came, and had put her things in her buggy, and she had driven off before the defendant, Epps, threw his pistol down on me. I am positive that the two men here in court, known as W. C. Epps and Joe McGraw, are the two men who were engaged in the robbery I have described. There is not a shadow of a doubt on earth in my mind that they are the men."

E. A. Peifer also testified, on direct examination, that: "When I first saw them, they were sitting on the counter in the store of Powers & Peifer, at Muenster. I had just came from supper when I first saw them. I went to the office and desk, in the store. The two defendants

started out, and went out at the front south door, and I followed them to the door. I asked them if there was anything I could do for them. They said they did not want anything. I then went back into the store; the defendants remained outside. I went back to the back part of the store, where Mr. Powers was waiting on a lady, and remained there a few minutes, and then went out on the porch where the two defendants were, and went off the porch to assist the lady into the buggy, who was going away. I returned into the store, and the two defendants came in the store from the front way and walked back to the grocery counter. Mr. Epps inquired for ten cents worth of tobacco, which I sold to him. He (Mr. Epps) paid me two nickles, which I put in the money drawer. I started then after a bucket of water. The well was about two hundred yards from the store. The defendants remained in the store when I left to go after water. On my return with the water, Mr. McGraw, the defendant, and smaller of the two defendants here in court, demanded of me, at the point of a pistol, to throw up my hands, and told me to come inside and keep quiet. When I came inside of the store, I saw the defendant, Epps, have J. W. Powers covered with a pistol, and he (Epps) then took me in charge also, and had me to turn my back towards him; and told both of us to go into the warehouse. After we got into the warehouse, the defendant, Epps, told me to turn around; that I looked to be a pretty smart fellow and said: 'I will just take this!' and he took my watch out of my pocket. The watch was an open faced, imitation box hinges and screw lid watch, both lids screwed on. It was a gold filled case, Hampton movement. The watch was worth about $35. It had also a rolled plated chain attached to it, pretty well worn, and had a tooth, supposed to be an elk tooth, attached to it as a charm. Just before starting us to the wareroom, defendant, Epps, told defendant, McGraw, to bring up the horses. McGraw went after the horses and brought them up near the south and back door. The defendant, Epps, ordered us into the warehouse. After taking my watch, he closed the door of the warehouse, fastening it on the inside of the store, leaving us in the warehouse, and telling us to keep quiet. After the door was closed, I jumped out of the north window of the warehouse, and I saw them running their horses in a northeast direction, and were then about a hundred yards distant. The defendant's were running their horses across the prairie when I saw them, after coming out of the warehouse. Neither of the defendant's had on any mask, or false face of any kind, and were not disguised in any way about the face, and were dressed ordinarily."

*Green & Culp* for relators.

*Mann Trice*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—The appellants were tried on a writ of habeas corpus, the trial judge refused bail, and this appeal is prosecuted. The indictment charges appellants with the offense of robbery, and that it

was committed by the use and exhibition of firearms. After hearing the evidence, the judge denied bail, on the ground that the defendants were indicted for a capital offense, under Article 722, of the Penal Code, as amended by the legislature (Acts 24th Leg., p. 89). We apprehend that the same rule provided in murder cases is also applicable to the offense of robbery, made capital by said last-mentioned statute. The constitution provides that all persons shall be bailable by sufficient sureties, unless charged with a capital offense, when the proof is evident; that is, the proof must be evident that the party is guilty of a capital offense. In the case at bar, the proof must be evident that a robbery was committed, that appellants are the guilty parties, and that they used firearms in its commission. The proof upon each of these propositions must be evident. We have examined the record, and, without discussing the evidence, we have come to the conclusion that, under the rules above announced, the appellants are not entitled to bail. The judgment is affirmed.

*Affirmed.*